1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JENNIFER A.,                    )    CASE NO. CV 11-01813 DSF (PLAx)
                                     )
12            Plaintiff,             )    FINDINGS OF FACT AND
                                     )    CONCLUSIONS OF LAW AFTER
13       v.                          )    COURT TRIAL ON
                                     )    ADMINISTRATIVE RECORD
14  UNITED HEALTHCARE                )
    INSURANCE COMPANY,               )
15                                   )
              Defendant.             )
16  _____ )

17                      **<u>INTRODUCTION</u>**

18            This action is brought pursuant to the Employee Retirement Income Security

19  Act of 1974 ("ERISA") (29 U.S.C. § 1001, *et seq.*).  Plaintiff Jennifer A. contends

20  she is entitled to coverage for residential mental health treatment at the Montenido

21  Treatment Center[1] beyond January 11, 2011 under the terms of the Azoff

22  Promotions, Inc. employee benefit plan (the "Plan").  After consideration of the

23  parties' trial briefs, oral arguments, the evidence in the Administrative Record,[2]

24  _____

25  [1]  Plaintiff refers to Monte Nido Treatment Center; Defendant refers to Montenido
26  Treatment Center.  The Court refers to this facility as "Montenido" throughout these
27  findings.

28  [2]  The Administrative Record is found at UHIC001 to UHIC341.  (Decl. of Custodian of
    Records as to Those Docs. Constituting the Admin. R. Before United Behavioral Health
    at 1.)

and the extrinsic evidence offered by Plaintiff on the issue of the alleged conflict of interest of United Behavioral Health ("UBH"),[3] the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

It is undisputed that: (1) Plaintiff was a covered participant in the Plan, (2) the Plan was insured by United Healthcare Insurance Company ("UHIC") and governed by the UnitedHealthcare Choice Plus Policy (the "Policy")[4], and (3) UHIC fully delegated claims administration authority for mental health services under the Plan to UBH.  The Plan requires UHIC to pay benefits for Covered Health Services.  (UHIC008.)  Under the Plan, UHIC had discretionary authority to administer claims and make factual findings regarding benefits and covered services or to delegate such authority.  (Id.)  The Plan unambiguously grants UHIC the right to delegate this discretionary authority "to other persons or entities that may provide administrative services for this Benefit plan, such as claims processing."  (UHIC008.)  It is undisputed that UHIC fully delegated its discretionary claims administration authority for mental health and substance abuse benefits to non-party UBH through an Administrative Services Agreement ("ASA") dated January 1, 2006.  (Decl. of Cheryl F. Knoblauch Ex. B. at UHIC344-49.)

The Plan provides in part:

**Covered Health Service(s)** - those health services, including services, supplies, or Pharmaceutical Products, which we determine to be all of

---

[3]  Trial courts may admit evidence outside of the administrative record on the issue of the "nature, extent and effect on the decision-making process" of an administrator's conflict of interest.  Nolan v. Heald College, 551 F.3d 1148, 1153 (9th Cir. 2009) (quoting Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. 2006)); see Burke v. Pitney Bowes Inc. Long-Term Disab. Plan, 544 F.3d 1016, 1028 (9th Cir. 2008).

[4]  The parties agree that the insurance policy in this case is the ERISA Plan.  The Court uses the terms "Policy" and "Plan" interchangeably.

the following:

- Provided for the purpose of preventing, diagnosing or treating a Sickness, Injury, Mental Illness, substance abuse, or their symptoms.
- Consistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines as described below.
- Not provided for the convenience of the Covered Person, Physician, facility or any other person.
- Described in this *Certificate of Coverage* under *Section 2: Exclusions and Limitations*.

In applying the above definition, "scientific evidence" and "prevailing medical standards" shall have the following meanings:

- "Scientific evidence" means the results of controlled clinical trials or other studies published in peer-reviewed, medical literature generally recognized by the relevant medical specialty community.
- "Prevailing medical standards and clinical guidelines" means nationally recognized professional standards of care including, but not limited to, national consensus statements, nationally recognized clinical guidelines, and national specialty society guidelines.

We maintain clinical protocols that describe the scientific evidence, prevailing medical standards and clinical guidelines supporting our determinations regarding specific services.  These clinical protocols (as revised from time to time), are available to Covered Persons on www.myuhc.com or by calling *Customer Care* at the telephone number on your ID card, and to Physicians and other health care

1      professionals on UnitedHealthcareOnline.

2  (UHIC061.)

3            **Section 1: Covered Health Services**

4            **16. Mental Health and Substance Abuse Services - Inpatient and**

5            **Intermediate**

6            Mental Health and Substance Abuse Services received on an inpatient

7            or intermediate care basis in a Hospital or an Alternate Facility . . . .

8            The Mental Health/Substance Abuse Designee, who will authorize the

9            services, will determine the appropriate setting for the treatment . . . .

10          Mental Health . . . Services must be provided by or under the direction

11          of the Mental Health/Substance Abuse Designee.  Referrals to a

12          Mental Health or Substance Abuse Services provider are at the

13          discretion of the Mental Health/Substance Abuse Designee, who is

14          responsible for coordinating all of your care . . . .

15  (UHIC016-017.)

16            **Section 2: Exclusions and Limitations**

17            **H. Mental Health/Substance Abuse**

18          2.      Mental Health Services . . . that extend beyond the period

19                necessary for short-term evaluation, diagnosis, treatment or

20                crisis intervention . . . .

21          8.      Services or supplies for the diagnosis or treatment of Mental

22                Illness . . . that, in the reasonable judgment of the Mental

23                Health/Substance Abuse Designee, are any of the following:

24               •    Not consistent with prevailing national standards of

25                   clinical practice for the treatment of such conditions.

26               •    Not consistent with prevailing professional research

27                   demonstrating that the services or supplies with have a

28                   measurable and beneficial health outcome.

- Typically do not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost effective.
- Not consistent with the Mental Health/Substance Abuse Designee's level of care guidelines or best practices as modified from time to time.

The Mental Health/Substance Abuse Designee may consult with professional clinical consultants, peer review committees or other appropriate sources for recommendations and information regarding whether a service or supply meets any of these criteria.

(UHIC028.)

**Schedule of Benefits**

**Mental Health and Substance Abuse Services**

[Y]ou must obtain prior authorization from the Mental Health/Substance Abuse Designee before you receive Mental Health Services.

(UHIC071.)

The Plan also references "level of care guidelines" that "apply to all levels of care for mental health conditions . . . and are used in conjunction with the guideline for the current level of care" and determine whether service at a particular level of a care will be authorized.  (UHIC342.)  As stated in the UHIC Policy Exclusions and Limitations, benefits will not be provided for mental health care "[n]ot consistent with the Mental Health/Substance Abuse Designee's level of care guidelines."  (UHIC028.)  The UBH "Level of Care Guidelines" applicable to "all levels of care for mental health conditions" specify in pertinent part:

**All of the following criteria must be met . . .**

1.    The member continues to meet the criteria for the current level of

1   care.

2       2.      The member continues to present with symptoms and/or history that

3              demonstrate a significant likelihood of deterioration in

4              functioning/relapse if transitioned to a less intensive level of care . . . .

5       3.      The treatment being provided is appropriate and of sufficient intensity

6              to address the member's condition and support the member's

7              movement toward recovery.

8       4.      The member is actively participating in treatment or is reasonably

9              likely to adhere after an initial period of stabilization or motivational

10             support . . . .

11      8.      Measurable and realistic progress has occurred or there is clear and

12             compelling evidence that continued treatment at this level of care is

13             required to prevent acute deterioration or exacerbation that would then

14             require a higher level of care . . . .

15      10.    The member cannot effectively move toward recovery and be safely

16             treated in a lower level of care, or in the case of outpatient care, is

17             discharged . . . .

18  (UHIC342-43.)

19       Plaintiff is a 33 year-old woman with a long history of the eating disorder

20  anorexia nervosa.  (Jennifer A. 203.)  Plaintiff is 5 feet 2 inches tall and has

21  weighed between 61 and 120 pounds.  (UHIC151.)  Prior to 2012, Plaintiff had a

22  series of admissions to inpatient treatment, partial hospitalization treatment, and

23  intensive outpatient treatment for her eating disorder between 1997 and 2006.[5]

24  (UHIC151.)

25       Between March 2010 and January 2011, while covered by the Plan, Plaintiff

26

27  [5]  The Administrative Record lists Plaintiff's prior treatment history as: Inpatient
treatment in 1997, 1999, twice in 2001, 2002, and twice in 2004; partial hospitalization

28  in 2002 and 2004; and intensive outpatient treatment in 2006.  (UHIC 151.)

was treated three times for her eating disorder.  Plaintiff was first treated in a partial hospitalization program at the Eating Disorder Center of California ("EDCC") beginning on March 19, 2010.  (UHIC150.)  At admission to EDCC, Plaintiff weighed 107 pounds.  (UHIC151.)  Plaintiff was also diagnosed with a movement disorder, paroxysmyal kiniogenic dyskinesia, and major depressive disorder.  (UHIC150.)

UBH, as claims administrator, pre-approved Plaintiff's treatment at EDCC and, after periodic reviews, continued renewing authorization for treatment until April 23, 2010.  (UHIC179-180.)  On April 23, 2010, a UBH physician, Dr. Natasha Sane, reviewed Plaintiff's progress in the partial hospitalization program, and denied authorization for partial hospitalization treatment level as not medically necessary "[a]fter reviewing [Plaintiff's] case and discussing it with the [EDCC] clinical director."  (UHIC 180.)  Dr. Sane explained the reasoning underlying the re-authorization denial verbally and followed up in writing to Plaintiff:

> [Y]our condition does not meet medical necessity level of care guidelines for eating disorder partial hospitalization level of care after 4/23/10.  Your weight gain has been consistent and you are at 94.5% of your ideal body weight . . . .  It seems that your treatment could occur safely and effectively at the intensive outpatient eating disorder level of care.

(UHIC180.)

Plaintiff was also informed about her options for appeal, including urgent appeal options, verbally and again in writing.  (UHIC180.)  There is no record of Plaintiff appealing the adverse benefits determination.

Plaintiff's second period of partial hospitalization at EDCC began on November 16, 2010.  (UHIC186-89.)  At admission to EDCC, Plaintiff weighed 96 pounds, 87 percent of her ideal body weight, and reported eating only 300 calories per day.  (UHIC187.)  In addition to the diseases diagnosed at the time of her first

1  admission, Plaintiff was also diagnosed with Obsessive Compulsive Disorder and

2  hypothyrodism.  (UHIC194.)  UBH authorized coverage for this second admission

3  to EDCC.  (UHIC188.)  UBH continually reviewed Plaintiff's partial

4  hospitalization level of care and, on December 1, 2010, UBH Associate Medical

5  Director Dr. Svetlana Libus, who is board certified in psychiatry (UHIC338),

6  reviewed Plaintiff's treatment with Dr. Terry Egan of EDCC and noted that

7  Plaintiff continued to meet the criteria "for the requested [level of care] due to

8  imminent risk of deterioration in functioning due to the presence of multiple and

9  complex psychosocial stressors that are significant enough to undermine treatment

10  at a lower level of care."  (UHIC201.)  On December 8, 2010, Dr. Libus again

11  consulted with Dr. Egan and re-authorized coverage at the same level of care.

12  (UHIC210.)

13       Plaintiff lost two pounds between December 1, 2010 and December 10, 2010

14  and weighed 93 pounds.  (UHIC203.)  On December 10, 2010, EDCC

15  recommended a higher level of care.  (Id.)  On December 13, 2010, Plaintiff was

16  admitted to residential treatment at Montenido at a weight of 91 pounds.

17  (UHIC214-15.)  A UBH  independent reviewer, Dr. Barbara Center, authorized

18  coverage for residential treatment and explained:

19         In the opinion of this reviewer, the patient does meet UBH medical

20         necessity guidelines for a brief period of stabilization in a mental

21         health/eating disorder residential treatment level of care as of 12/13/10.

22         Reassessment after two days to determine whether the patient is

23         compliant with her meal plan and whether she continues to purge as

24         criteria for improvements that would allow the patient to continue

25         treatment at a lower level of care, should be considered.

26  (UHIC219.)

27       On December 16, 2010, UBH authorized six more days of residential

28  treatment and noted that Plaintiff weighed 90.8 pounds, 78 percent of her ideal

body weight and was on a refeeding protocol.  (UHIC223.)

On December 23, 2010, Dr. Murray Zucker of UBH reviewed Plaintiff's level of care with Dr. Schneider, the program Primary Care Provider, noted Plaintiff weighed 92.6 pounds, had normal vital signs and laboratory results, was on a diet of 1900 calories, and was eating all meals.  (UHIC232.)  Dr. Zucker re-authorized Plaintiff's residential treatment.  (Id.)  On December 28, 2010, UBH noted Plaintiff weighed 93 pounds, 80 percent of her ideal body weight, and authorized three more days of residential treatment.  (UHIC233-335.)  On December 30, 2010, UBH noted that Plaintiff "appears to be improving slightly with [medicine] changes" and "refused snack today but was able to make up [calories] during lunch; [patient] was also confronted by peers and was able to process well and take responsibility."  (UHIC238.)  UBH authorized four more days of residential treatment.  (UHIC239.)  On January 4, 2011, UBH again reviewed Plaintiff's treatment, noted her weight gain to 93.8 pounds, 81 percent of ideal body weight, noted she was eating 1900 to 2100 calories per day, and that "[patient] has not been caught hiding food despite having urges to do so." (UHIC242.)  UBH authorized two more days of residential treatment.  (UHIC243.)

On January 5, 2011, UBH reviewed Plaintiff's level of care and Dr. Libus spoke with Plaintiff's treating physician and noted that "[patient] is doing better, but [continues] having urges to hide food, exercise, but [h]as been compliant [with] her meal plan.  Severe anxiety around food, resistant to [calorie] increase, has to sit by staff during her meals, obsessed [with] distorted body image."  (UHIC246.)  Dr. Libus renewed authorization for residential care until January 7, 2011. (UHIC247.)  On January 11, 2011, UBH reviewed Plaintiff's condition, noted that her weight was 95.4 pounds, 82 percent of her ideal body weight, that her family session with her father "went very well," and that "she is more motivated and moving in the right direction."  (UHIC252.)  The UBH reviewer also noted that Plaintiff "was caught hiding food at snack last week . . . and needs observation

after meals." (Id.)  UBH authorized two additional days of residential treatment. (UHIC254.)

The next day, January 12, 2011, Dr. Libus again reviewed Plaintiff's level of care. (UHIC257.)  Dr. Libus spoke to Dr. Egan and noted that Plaintiff still weighed 95.4 pounds, 82 percent of her ideal body weight, was "[continually] gaining about 1 [pound] per week," had stable vital signs and a diet of 1800 calories, was "doing better, [was] compliant [with] her meal plan," still had continued "anxiety around food [and was] resistant to [calorie] increase," but that her "motivation is much better as well as support [] dedication to [treatment] this time around." (UHIC257.)[6]  Dr. Libus then concluded Plaintiff's condition did "not meet medical necessity level of care guidelines [for] [r]esidential level of care since it can be safely treated at Partial Hospitalization Level of care." (Id.)  Dr. Libus then made an adverse benefits determination and denied further authorization for residential care beginning on January 12, 2011. (UHIC257-58.) UBH notified Montenido by phone of the adverse benefits determination and left a voicemail including an urgent appeals option for Montenido's Assistant Clinical Director Keesha Broome, Marriage and Family Therapist ("MFT") at 3:37 p.m. the same day. (UHIC258.)

---

[6]  Plaintiff submitted notes from Keesha Broome recounting her conversations with UBH representatives. (Decl. of Keesha Broome, 2-3; Jennifer A. 861.)  Broome's notes on the conversation between Dr. Libus and Dr. Egan, a conversation in which Broome participated, do not document any significant differences with Dr. Libus's description of the conversation in UBH's records. (See Broome Decl., Ex. A; UHIC256-57; Jennifer A. 861.)  Broome's recollection of the conversation is:

> 1/12/2011 - Dr. Egan, Keesha and Dr. Libus spoke.  She said that she has followed this case for a while and feels like the client has made some shifts for the first time ever.  She said that she wanted to 'compliment' us on the work we are doing with her.  She said with that being said she doesn't feel like the client meets medical necessity but we could appeal this decision.  She was impressed with the family work we've done and suggested that this means the client will have more support to transition.

(Broome Decl. Ex. A; Jennifer A. 864.)

In a letter dated January 13, 2011, Dr. Libus informed Plaintiff, Dr. Egan, and Broome, of the adverse benefits determination.  (UHIC274.)  Dr. Libus's letter reads in pertinent part:

> I have received the plan for your continued treatment at Montenido Treatment Center.  After reviewing the case and discussion with the attending provider, I find that your condition does not meet medical necessity level of care guidelines for the mental health residential level of care since you can safely be treated at the mental health partial hospitalization level of care.   Reference:  Level  of  Care Guidelines/Mental Health Residential: Continued Service criteria #2, 3 and 4.

(UHIC275.)  Dr. Libus then quoted the relevant UBH Level of Care Guidelines. (UHIC274-75.)  Dr. Libus's letter closed with: "Please refer to the enclosed form(s) [Member Appeal Rights and Instructions] for information about your available options to appeal or dispute this determination."  (UHIC283.)  The enclosed forms included detailed instructions on how to appeal the adverse benefits determination administratively to UBH and provided a form for petitioning the California Department of Insurance for an Independent Medical Review ("IMR")[7] along with instructions on how to appeal the decision.  (UHIC286-93.)

On January 14, 2011, Broome spoke by phone with a UBH representative, Silvia Kaplan, MFT.  (UHIC265-66.)  Broome stated that "[patient] remains in [treatment] and [Broome] is speaking with [treatment] team and will [call back] if they are requesting urgent appeal."  (UHIC262.)  On January 18, 2011, Broome

---

[7]  An IMR is available to claimants under California Insurance Code section 10169.  It provides for independent review of an insurance company's adverse benefits determination regarding medical necessity and other specified issues by the California Department of Insurance through expert independent professionals.  It is available to claimants after all internal insurance company appeals procedures have been exhausted. See California Department of Insurance, Consumers: IMR Program (Revised February 2012), http://www.insurance.ca.gov/0100-consumers/0020-health-related/0020-imr/.

called UBH and requested an urgent appeal.  (Id.)  The urgent appeal was scheduled for the next day at 9:30 a.m. with UBH Associate Medical Director Dr. Jeffrey C. Uy, MD.[8]  (UHIC262.)

On January 19, 2011, Dr. Uy reviewed the available documentation and spoke with Broome, who provided updated information regarding Plaintiff's condition and treatment:

> [T]here has been no progress in planning towards transitional living ([patient] was living alone [previously]). [Broome] states this is because [Plaintiff] remains[s] on ["Level 4"] and needs to be on ["Level 2"] to consider stepping down; [with] the [level] system being an internal system unique to the [facility]. [Patient's] clinical is [minimally] changed from [previous] review, still [with continuing depression 5/10, continuing anxiety 7-9/10, and no suicidal intent] . . . 96 pounds . . . 83% [of ideal body weight]. [Patient] is exhibiting some passive resistance []

---

[8]  Dr. Uy is board certified in psychiatry as a general adult psychiatrist.  (Uy Dep., Ex. 2, Feb. 28, 2012; UHIC339.)  Dr. Uy does not consider himself to be a specialist in the area of eating disorders; he considers himself to be a "board-certified general adult psychologist."  (Uy Dep. 49:24-50:1-3.)  Dr. Uy had experience directly treating patients with eating disorders during his employment in private practice at the University of Southern California (USC) Psychiatry and Psychology Associates from 2003 to 2006 for approximately 10 to 12 hours per week.  (Uy Dep. 31:2-21; UHIC340.)  He estimated that "[m]aybe more than 25 percent" of the patients he consulted with or treated directly were being treated for an eating disorder.  (Uy Dep. 31:25-32:11.)  Dr. Uy was also employed by USC as an Assistant Clinical Professor at the University of Southern California (USC) Keck School of Medicine from 2003 to 2007 and supervised residents in the Psychiatric Emergency Room and Acute Adult Psychiatric Inpatient Unit at USC for approximately 40 hours per week.  (Uy Dep. 32:20-33:21; UHIC340.)  As an Assistant Clinical Professor, Dr. Uy estimated that between 25 and 50 percent of his caseload consisted of patients being treated for eating disorders.  (Uy Dep. 34:9-10.)  Additionally, Dr. Uy testified that at USC he gave "lectures on eating disorders, and . . . would have to go back and study what all the current literature was coming out" as part of preparing for those lectures and took courses on eating disorders as part of the 25 hours per year of continuing medical education required of all physicians.  (Uy Dep. 50:16-22.)

1   but has not engaged in any acting out [behaviors for example]

2   purging/exercising surreptitiously . . . .

3   (UHIC262.)

4       Dr. Uy estimated he spent 45 minutes to an hour reviewing Plaintiff's

5   appeal.  (Uy Dep. 72:7-9.)  Dr. Uy took into account Dr. Libus's preceding review

6   of Plaintiff's treatment and gave it weight because "[s]he's a well-qualified doctor

7   whose opinion is important," but he did not give more weight to Dr. Libus's

8   opinion than he did to Plaintiff's clinician at Montenido, nor did he give more

9   weight to the clinician's opinion than Dr. Libus's.  (Uy Dep. 58:19-59:19.)  UBH

10  notified Broome by phone of the outcome of the urgent appeal at 12:47 p.m. that

11  same day.  (UHIC263.)

12      Broome's notes of her conversation with Dr. Uy do not contradict Dr. Uy's

13  notes and add little with respect to new arguments for keeping Plaintiff at the

14  residential level of treatment:

15      1/19/2011 - Appeal done with Dr. Uy [].  He said that the client doesn't

16      appear to meet criteria.  Told him that given her history of leaving

17      treatment prior to weight restoration and learning how to maintain has

18      caused her to crash and have to be hospitalized.  Also discussed how the

19      PKD [Paroxysmyal Kinesigenic Dyskinesia] diagnosis should be

20      considered as the neurological issue gets exacerbated by being at a lower

21      weight.  Dr. Uy said that the insurance benefit is not meant for long-term

22      care and seeing as how she has already been with us for 30 days she has

23      gotten a lot out of her benefit.  Told him that her parents will be paying

24      to keep her here as they are listening to the treatment team's advice that

25      she needs continued care at this level.  He recommended that client step

26      down to PHP [Partial Hospitalization].  (Broome Decl. Ex. A; Jennifer

27      A. 864.)

28  In a letter dated January 19, 2011, Dr. Uy informed Plaintiff and Broome of

the appeal decision to uphold the adverse benefits determination. (UHIC308-13.)  Dr. Uy's letter reads in part:

> Coverage was not available for the service(s) . . . because UBH determined that it did not meet the criteria for approval.  The specific reason for the denial was member's condition did not meet medical necessity level of care guidelines for mental health residential level of care . . . .
>
> This review involved a telephone conversation with your provider. After fully investigating the substance of the appeal, including all aspects of clinical care involved in this treatment episode, I have determined that benefit coverage is not available for the following reason(s):
>
> It appears that you do not meet United Behavioral Health's Level of Care Guidelines medical necessity criteria 2, 3, and 4 for continued stay in a mental health / eating disorders residential treatment center beyond the last covered day of 1/11/2011 as per discussion with your treating physician your condition is reported to be improved from the time of your admission.  The physiological instability, severe mood symptoms, and behavioral disturbances that necessitated your initial hospitalization have been stabilized.  You are medically stable, your current mood symptoms are reported to be improved and your behavior has been reasonably well-controlled.  You are described as cooperative and appropriate with staff, are attending all groups, compliant with your medications, and there have been no recent acting-out behaviors to suggest impulse control dysregulation or risk of harm.  It appears that you are doing well at this time and can

14

1    maintain stability and continue to progress in your recovery with

2    ongoing treatment in a less strict care setting.

3  (UHIC308-09.)  Dr. Uy then quotes the text of the UBH Level of Care Guidelines

4  to which he referred in his letter.  (UHIC309.)  Dr. Uy's letter closes with: "This is

5  the Final Adverse Determination of your internal appeal.  All internal appeals

6  through UBH have been exhausted.  Please refer to the enclosed form(s) [Member

7  Appeal Rights and Instructions] for information about your available options to

8  appeal or dispute this determination."  (UHIC310.)  The enclosed forms again

9  included detailed instructions on how to appeal the adverse benefits determination

10  administratively to UBH and provided a form for petitioning the California

11  Department of Insurance for an IMR along with instructions on how to appeal the

12  decision.  (UHIC315-21.)

13        After UBH's denial of benefits, Plaintiff paid for the remainder of her

14  treatment at Montenido from January 12, 2011 to April 12, 2011.  (Jennifer A.

15  004.)  Plaintiff was discharged from Montenido after completing the program on

16  April 12, 2011.  (Jennifer A. 634.)  Plaintiff's Montenido discharge summary lists

17  her discharge weight at 104.6 pounds.  (Jennifer A. 643.)[9]

18                            **CONCLUSIONS OF LAW**

19        ERISA permits an individual to challenge a denial of benefits in federal

20  court.  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008) (citing 29 U.S.C. §

21  1132(a)(1)(B)).[10]  Plaintiff does not challenge the benefits denial under any other

22

23        [9]  Obviously, the information in this paragraph was not in the Administrative Record.

24        [10]  Plaintiff's ERISA challenge to UHIC's denial of mental health benefits is properly
     before this Court, as Plaintiff exhausted all UBH's administrative remedies (see
25   UHIC310) (explaining that "[a]ll internal appeals through UBH have been exhausted").
     Under the relevant Department of Labor regulations, claimants challenging ERISA
26   employee benefit plan denials are not required to exhaust any state law procedures, such
     as the California IMR process, prior to challenging the benefits determinations in
27   federal court.  29 C.F.R. § 2560.503-1(k)(2)(ii) ("Claimants . . . need not exhaust . . .
     State law procedures prior to bringing suit under section 502(a) of [ERISA]").
28

                                    15

law.[11]

Depending on the language and structure of an ERISA plan, a district court reviews a plan administrator's decision to deny benefits either *de novo* or for an abuse of discretion.  The district court reviews the determination "'under a *de novo* standard' unless the plan provides to the contrary."  Id. at 111 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)); Harlick v. Blue Shield of Cal., 686 F.3d 699, 706-07 (9th Cir. 2012).  The decision will be reviewed for an abuse of discretion, however, where "the plan provides to the contrary by 'granting the administrator or fiduciary *discretionary authority* to determine eligibility for benefits.'"  Glenn, 554 U.S. at 111 (quoting Firestone, 489 U.S. at 115); Harlick, 686 F.3d at 707 (citing Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 967 (9th Cir. 2006) (en banc)).  The parties agree that the Plan contains a clear, unambiguous grant of discretionary authority to interpret the Plan's terms and determine benefits eligibility through the ASA dated January 1, 2006.  (Pl.'s Opening Trial Br. 11; Def.'s Opening Trial Br. 16.)  The Court therefore applies an abuse of discretion standard.

The Court's application of an abuse of discretion standard must be "'tempered by skepticism' when the plan administrator has a conflict of interest in deciding whether to grant or deny benefits."  Harlick, 686 F.3d at 707 (quoting Abatie, 458 F.3d at 968-96)).  "In such cases, the conflict is a 'factor' in the abuse of discretion review" with the weight of that factor dependent "on the severity of the conflict."  Harlick, 686 F.3d at 707 (citing Abatie, 458 F.3d at 968; Glenn, 554 U.S. at 108).  The most frequent conflict arises "when the same entity makes the coverage decisions and pays for the benefits."  Harlick, 686 F.3d at 707 (citing Glenn, 554 U.S. at 108).

---

[11]  Plaintiff does not challenge the denial of benefits under California law, for example, under the California Mental Health Parity Act, California Health & Safety Code § 1374.42.

Several factors influence the weight given to the conflict factor in an abuse of discretion review.  The conflict is "more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision."  Glenn, 554 U.S. at 117; Harlick, 686 F.3d at 707.  The conflict is given more weight "if there is a 'history of biased claims administration.'"  Harlick, 686 F.3d at 707 (quoting Glenn, 554 U.S. at 117).  Additional skepticism will apply for procedural irregularities under ERISA where "the administrator gave inconsistent reasons for a denial, failed to provide full review of a claim, or failed to follow proper procedures in denying the claim."  Id. (citing Lang v. Long-Term Disability Plan, 125 F.3d 794, 798-99 (9th Cir. 1997); Friedrich v. Intel Corp., 181 F.3d 1105, 1110 (9th Cir 1999)).[12]

The conflict, however, "is less important when the administrator takes 'active steps to reduce potential bias and to promote accuracy,' such as employing a 'neutral, independent review process,' or segregating employees who make coverage decisions from those who deal with the company's finances."  Id. (quoting Glenn, 554 U.S. at 117); Abatie, 458 F.3d at 969 n.7.  Further, the Ninth Circuit views "the conflict with a 'low' 'level of skepticism' if there's no evidence of malice, of self dealing, or of a parsimonious claims-granting history."  Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 868 (9th Cir. 2008).  In considering any conflict and applying the abuse of discretion standard, the Supreme Court has "emphasized under Glenn, 'a deferential standard of review remains appropriate even in the face of a conflict.'"  Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 647 (9th Cir. 2011).  As the Ninth Circuit has made clear: "We now know that the administrator's decision cannot be disturbed if it is reasonable."  Id. at 676.

In evaluating the specific decision of the claims administrator, the Ninth

---

[12]  Plaintiff does not appear to contend that UBH provided inconsistent reasons for the benefits denial.

Circuit has cautioned that courts "may not merely substitute our view for that of the fact finder."  Id. (citing United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).  Proper abuse of discretion review examines whether the claims administrator's decision was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record."  This review applies "with the qualification that a higher degree of skepticism is appropriate where the administrator has a conflict of interest."  Solomaa, 642 F.3d at 676.

In order to consider the extent of UBH's conflict of interest as claims administrator, this Court examined extrinsic evidence regarding the structure and financial relationship between the Plaintiff's Plan benefits payor UHIC and the claims administrator, UBH.  It is undisputed that UHIC and UBH are corporate subsidiaries of the same parent, United Health Group, Inc.  (Def.'s Opening Trial Br. 4; Pl.'s Opening Trial Br. 12; Dep. of Patrick Scallen 19:5-20:19; 25:6-26:24.) The parties dispute the extent to which skepticism should apply in the abuse of discretion analysis, as the corporate identities of the parties are in some sense distinct.[13]  This is not a clear conflict of interest case, as earnings and expenses from both UHIC and UBH are reported by their parent corporation.  In any event, as the Ninth Circuit explained, the conflict is "less important" when the insurer "segregat[es] employees who make coverage decisions from those who deal with the company's finances."  Harlick, 686 F.3d at 707.

While Plaintiff makes much of the shared corporate profit and loss reporting from the UBH and UHIC subsidiaries by United Health Group, Inc., Plaintiff does not show a direct connection between the profit and loss reporting and financial influences among UBH, UHIC, and United Health Group, Inc. with respect to claims administration and benefits payouts.  Bonuses and compensation for UBH

---

[13]  Both companies share the same corporate parent, United Health Group, Inc., but UHIC is a Connecticut corporation (Scallen Dep. 20:7-11) and UBH is a California corporation (Scallen Dep. 26: 22-8).

physician reviewers are not connected to the number of authorized or denied benefits requests.  (Decl. of Murray Zucker 3:5-7.)[14]  The approval rate of benefits requests and appeals is not considered during the review or compensation decisions for UBH reviewing physicians.  (Id. 3:23-25.)  UBH physician reviewers are salaried employees and not paid by the number of reviews they complete.  (Uy Dep. 46:9-11.)  Plaintiff has failed to connect the overall corporate and financial reporting structure of United Health Group, Inc., to UBH benefits case decisions in a causal or meaningful way.[15]  Finally, Plaintiff has also failed to produce evidence of UBH or any United Health Group, Inc., claims administrator having a history of "malice, self dealing, or . . . a parsimonious claims-granting history" in this case or

---

[14]  Plaintiff has moved to strike the Declaration of Murray Zucker, M.D. because Defendant failed to disclose Dr. Zucker's declaration as required by Federal Rule of Civil Procedure 26.  This motion is DENIED.  Plaintiff admits Dr. Zucker was listed as a potential witness in Defendant's Rule 26 initial disclosures and Plaintiff had the opportunity to depose him if desired. (Pl.'s Mot. to Strike Declaration of Murray Zucker, M.D. 3.)  Even if, as Plaintiff claims, Defendant's initial disclosures were deficient under Rule 26 in identifying Dr. Zucker as one of 19 UBH employees who "has information about plaintiff's health care benefits claim" and not providing sufficiently specific information about Dr. Zucker's role as a supervisor and UBH Medical Director relating to evaluating and compensating UBH reviewers in those disclosures, that deficiency was harmless.  The weight of the skepticism this Court applies in this case remains unchanged without Dr. Zucker's deposition and thus the outcome of the abuse of discretion analysis remains the same.  Dr. Uy's testimony about physician reviewers as salaried employees, (Uy Dep. 46:9-11), his answer of "absolutely not" to the question of whether he had "any financial incentive to deny a claim for residential treatment by an eating disorder patient either on a pre-authorization or an appeal basis," (Uy Dep. 87:4-11), and his testimony that approvals and denials of authorization requests are not a part of productivity evaluations, (Uy Dep. 88:19-89:2), provides sufficient support, standing alone, for the Court's chosen skepticism level.

[15]  There is a United Health Group Stock Incentive Plan for which all United Health Group employees and those of its subsidiaries are eligible.  (Scallen Dep. 55:9-56:6.)  Plaintiff has failed to establish under what criteria stock options are awarded and has failed to tie the award of stock options to UBH benefit determination decisions.  (See id. 56:24-58:13.)  There is no evidence that Dr. Uy or Dr. Libus or any other UBH physician reviewers were paid through the Stock Incentive Plan or through means other than a yearly salary.

any others.  Thus, when this finding is combined with segregation of UBH physician reviewers from the parent corporation financial structure and UHIC payment considerations, the level of skepticism applied here is "low."  See Saffon, 522 F.3d at 868.

This Court therefore conducts its review of UBH's benefits denial decision under the abuse of discretion standard with a low level of skepticism.  Applying that standard, the Court finds that UBH did not abuse its discretion in its January 12, 2011 denial of Plaintiff's claim for the residential level of mental health benefits under the UHIC Plan.[16]  Dr. Libus and Dr. Uy provided reasonable justifications for their determinations. UBH's decision to deny Plaintiff coverage at the residential level was reasonable.  UBH complied with ERISA's procedural strictures in denying coverage, timely notifying Plaintiff, and providing Plaintiff notice of when and how she could appeal the adverse benefits determinations.

Dr. Libus's decision to deny coverage at the residential level of care was based on considered medical judgment, documented both in UBH administrative records, (UHIC257), and a letter to Plaintiff and her treatment providers, (UHC274-75).  In concluding Plaintiff did not meet the relevant level of care guidelines for the residential level of care, Dr. Libus's letter directly references Plaintiff's consistent weight gain, body weight at 82 percent of her ideal, improved motivation, stable vital signs and compliance with her meal plan.  (UHIC257-58.) This justification was in line with the improvement Dr. Libus noted on January 5, 2011.  (UHIC247.)  Plaintiff's condition was steadily improving and a reasonable physician could have concluded – as did Dr. Libus – that Plaintiff no longer met the level of care guidelines for residential treatment.

As required under ERISA, Dr. Libus's benefits denial letter explained the application of her clinical judgment, the guidelines on which she relied, and Plaintiff's options for appeal.  (UHIC275.)  Dr. Libus's clinical judgment as a

---

[16]  UBH would have approved a partial hospitalization level of care.

physician board certified in psychiatry, as specified in her denial letter, is far from "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." See Salomaa, 642 F.3d at 673.  To the contrary, Dr. Libus's conclusions were based on her evaluation of Plaintiff's improvement, her conversations with Plaintiff's treatment providers, and her medical opinion that Plaintiff could have been safely treated at the partial hospitalization level of care.  (UHIC275.)[17]

There was no abuse of discretion in Dr. Uy's review of Plaintiff's appeal. Dr. Uy explained that, as a result of his conversations with Plaintiff's treatment provider, he concluded the Plaintiff's earlier "psychological instability, severe mood symptoms, and behavior disturbances," had "been stabilized," and the Plaintiff's general attitude towards and compliance with treatment had improved to the point where, in his clinical judgment, the Plaintiff could be treated effectively in a less restrictive care setting.  (UHIC308.)  Dr. Uy, a board certified psychiatrist with substantial experience treating patients with eating disorders and teaching medical students about how to treat eating disorders while at USC, considered the opinions of Plaintiff's "treatment team" as conveyed by Broome and reasonably exercised his clinical judgment in concluding that Plaintiff did not meet the criteria for residential treatment.  His letter explained the rationale underlying his decision and referred directly to the relevant UBH level of care guidelines.

In total, review of the Administrative Record establishes that UBH, Dr. Libus, and Dr. Uy had engaged in "an ongoing, good faith exchange of information between the administrator and the claimant," as shown in their clinical notes and

---

[17] While UBH's initial benefits denial letter and attachments do not contain an explicit statement, "set forth in a manner calculated to be understood by the claimant," that "claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits," as required under 29 C.F.R. Section 2560.503-1(j)(3), there is no showing that the lack of this statement prejudiced Plaintiff, as she was able to request an urgent appeal and have her case fully considered.

denial letters; thus this Court must provide UBH as claims administrator "broad deference, notwithstanding a minor irregularity." Abatie, 458 F.3d at 972 (quoting Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan, 349 F.3d 1098, 1077 (9th Cir. 2003)).  The documented extensive and regular conversations between UBH and Montenido clinicians throughout treatment provide evidence of the existence of an "ongoing, good faith exchange."  Broome's notes of the conversations between herself and Dr. Uy do not change the finding that UBH's benefits denials were reasonable.  Broome raised Plaintiff's "history of leaving treatment prior to weight restoration and learning how to maintain has caused her to crash and have to be hospitalized," as well as her movement disorder diagnosis with Dr. Uy, and he was able to consider this information before he issued his decision upholding the benefits denial.  (Broome Decl. Ex. A.)  Nothing in Broome's notes or anywhere else in the record suggests that Dr. Uy failed to consider any relevant treatment history or that he was acting in bad faith.  Notably, there is no evidence in the record that Plaintiff's treating physician (or any other medical doctor or psychiatrist) directly expressed – either orally or in writing –  a contrary opinion regarding the medical necessity for Plaintiff to remain in a residential level of treatment for her eating disorder after January 11, 2011 – or that such level of care was covered by the Plan.[18]

Even after applying a low level of skepticism based on UBH and UHIC sharing a common corporate parent, this Court cannot characterize UBH's benefits denial decision as "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." Salomaa, 642 F.3d at 676.  To the contrary, Dr. Libus and Dr. Uy, after continuous consultation with Plaintiff's treatment providers, came to a reasonable conclusion as medical

---

[18]  At most, the record shows Broome told Dr. Uy that Plaintiff's parents were "listening to the treatment team's advice that she needs continued care at this level."  (Broome Decl. Ex. A; Jennifer A. 864.)

professionals.

Finally, Plaintiff has submitted the American Psychiatric Association Practice Guideline for the Treatment of Patient with Eating Disorders ("APA Guideline") as extrinsic evidence for this Court to consider in connection with evaluating the reasonableness of Defendant's medical necessity benefits denial.[19] This Court concludes it is improper to consider this type of extrinsic evidence under an abuse of discretion analysis, as the Ninth Circuit has made clear that "[j]udicial review of an ERISA plan administrator's decision on the merits is limited to the administrative record," Montour v. Hartford Life & Accident Ins. Co., 588 F.3d 623, 632 (9th Cir. 2009), and consideration of other extrinsic evidence is generally only appropriate on *de novo* review or in determining whether and to what extent a conflict of interest exists.  Plaintiff had many opportunities to present UBH with differing treatment views based on the Guideline and failed to do so.  It is improper to consider the Guideline in this case.

Even if the Court considered the Guideline, however, the result of the abuse of discretion analysis would be unchanged.[20]  By its own terms, the APA

[19]  Plaintiff also submitted two scholarly journal articles regarding eating disorders, (Jennifer A. 995-1006), one published in 2001 and the other published in 1999, without explanation, expert testimony in any form as to their general acceptance in the medical community, or direct argument as to their applicability to Plaintiff's particular medical treatment.  Plaintiff also failed to cite to or otherwise rely on either of these articles in appealing the adverse benefits determination to UBH.  Even assuming *arguendo* the relevance of these articles, they cannot serve as a substitute for UBH physicians' clinical judgment.  For example, Dr. Uy was providing training to medical students and residents and direct treatment to eating disorder patients as an Assistant Clinical Professor at USC on eating disorder issues years (2003-2007) after the publication of these articles took place and thus may reasonably be seen as having been aware of the best practices in psychiatry during the time period *after* publication of these articles – rendering their probative value minimal at best.

[20]  Defendant objects to and moves to strike Plaintiff's evidence Bates-stamped as Jennifer A. 001-1006 as inadmissible and outside the Administrative Record.  The objection is OVERRULED and the motion is DENIED as to the Montenido Treatment Records and Declaration of Keesha Broome.  The proffered evidence was probative as

Guideline, published in 2006 (Jennifer A. 866), is "not intended to be construed or to serve as a standard of medical care" as "[s]tandards of medical care are determined on the basis of all clinical data available for an individual patient and are subject to change as scientific knowledge and technology advance and practice patterns evolve." (Jennifer A. 870.)  Dr. Libus and Dr. Uy considered Plaintiff's treatment status and history.  As they explained in their denial letters and notes in the Administrative Record, they denied coverage for the residential level of care based on Plaintiff's individual clinical data and their medical judgment as board certified psychiatrists with professional experience treating patients with eating disorders.  The APA Guideline does nothing to alter the reasonableness of their medical judgment.  Nor does it change or supersede the clear Plan terms.

Defendant's denial of benefits for residential mental health coverage for Plaintiff's treatment at Montenido after January 11, 2011 was based on the reasonable clinical judgment of UBH reviewing physicians and was not an abuse of discretion.

Judgment is for Defendant.


September 11, 2012

_Dale S. Fischer_ _____

Dale S. Fischer
United States District Judge

---

to what the claims administrator considered in evaluating Plaintiff's level of care needs, medical history, and the treatment she was receiving at Montenido.  The objection is SUSTAINED and GRANTED as to the APA Guideline and Medical Studies for the reasons explained above.

Even if the admissible portion of Plaintiff's extrinsic evidence were not considered, the Court's ruling on the Defendant's submitted Administrative Record would have been sufficient to sustain its judgment as it provided sufficient reasons for upholding the claim administrator's decision under an abuse of discretion standard.